Filed 6/8/23 P. v. Collins CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>PATRICK AARON COLLINS,<br><br>      Defendant and Appellant. | H049891<br>(Santa Cruz County<br>Super. Ct. No. 19CR00635) |

Defendant Patrick Aaron Collins was convicted by a jury of second degree murder (Pen. Code, § 187)[1] after he shot and killed his girlfriend, Victoria Seidlinger. On appeal, he argues that defense counsel was ineffective for failing to secure a final ruling on the admissibility of expert testimony on "alcoholic blackouts" and failing to seek admission of his prior statement that he was "blackout drunk" the day of the crime. He further argues that the trial court erred in declining to instruct the jury on involuntary manslaughter due to voluntary intoxication causing unconsciousness. We find no prejudicial error and affirm the judgment.

---

[1] Unspecified statutory references are to the Penal Code.

## I.    BACKGROUND

**A.    *The Operative Information***

On September 11, 2020, the Santa Cruz County District Attorney filed a first amended information charging Collins with murder (§ 187, subd. (a)), further alleging that during the commission of the murder, Collins personally and intentionally discharged a firearm (§ 12022.53, subd. (d)).

**B.    *The Prosecution's Case***

**1.    *Collins and Seidlinger's Relationship***

Seidlinger lived on the same rural property in Aptos as her husband, Stephen Seidlinger—Stephen lived in the main house and Seidlinger resided in a detached secondary residence, a converted barn.[2]  Although Seidlinger and Stephen were never legally divorced, they were separated and remained good friends.  In 2018, Seidlinger started working as a bartender at Sir Froggy's, which is how she met Collins.  Seidlinger and Collins became romantically involved, and Collins eventually moved in with Seidlinger.

**2.    *The Offense***

On January 30, 2019, Collins went to JJ's, a local bar, at around 11:30 a.m. or noon.  He ordered a beer and a shot and played a round of pool with one of the regulars.  Benjamin Barber chatted with Collins at the bar, and Collins told Barber that he was dating Seidlinger but was worried about the age difference between them (Seidlinger was 61 years old and Collins 36 years old at the time).  Barber thought Collins was intoxicated because he was slurring his words and appeared "glossy eyed."

According to Nikki Harding, a bartender at JJ's, Collins stayed at the bar for about three hours and had three or four beers and "probably" three shots.  His mood seemed

---

[2] We refer to Stephen by his first name for clarity.

2

fine, and Harding did not notice anything out of the ordinary. Collins left at around 3:00 or 3:30 p.m. When Collins left, Harding did not see him swaying or stumbling, and she did not think he appeared intoxicated;[3] she had no concerns about him driving home. Barber, however, thought that Collins should not be driving, and he offered to give him a ride home, which Collins declined.

Later that afternoon, Stephen was in the kitchen of the main house when Collins came inside without knocking. Collins told Stephen to call 911 because he had killed Seidlinger. Stephen was "aghast," and he called 911 at approximately 4:13 p.m. to report Seidlinger's murder. Stephen asked Collins several times whether he had actually killed Seidlinger, and Collins said yes. Collins told the 911 dispatcher that he was "drunk as fuck" and "just took a 12-gauge shotgun and blew my girlfriend's head apart."

As Collins spoke to the 911 dispatcher, Stephen retrieved a gun from his bedroom and shot Collins. Collins responded by using a pocketknife to stab Stephen several times, until Stephen blacked out. Collins then resumed speaking to the 911 dispatcher and requested police and medical help.

### 3. *The Police Response and Collins's Statements at the Scene*

Multiple deputies of the Santa Cruz County Sheriff responded to the scene of the crime. They found Collins lying on the living room floor with a gunshot wound to his torso and a .45-caliber pistol next to his head. Stephen was sitting on the couch, holding his neck. As the deputies yelled among themselves, Collins interjected, "You all need to shut the fuck up. I'll tell you what's up."

As Deputy Drew Renwick administered first aid to Collins, Collins made multiple statements. Collins said that he had "put a 12[-]gauge to a woman down the hill" and that

---

[3] Harding retrieved surveillance videos of the interior and exterior of the bar for officers to review. Some of the surveillance videos were later admitted into evidence.

3

he had "bl[own] [his] girlfriend's brains out with a 12[-]gauge." Collins also said, "I done fucked up. I got drunk and fucked up," and "I'm gonna go to prison for a long time[,] don't be gentle with me. I want someone to take care of my dog." Renwick recalled that when additional emergency medical personnel came into the house, Collins said: "[H]ello EMTs and first responders[,] I just shot my girlfriend in the head with a 12[-]gauge." According to Deputy Doug Smith, Collins told law enforcement: "[B]efore you be too gentle[,] I just took a shotgun to a woman down the hill." Collins repeatedly said that he should be left to die.

Renwick believed that Collins was "intoxicated a little bit." Collins's speech was slurred, his eyes were red and bloodshot, and he smelled of alcohol. But Renwick believed that Collins nonetheless "had an idea of what was going on" and was able to "convey clearly" what had happened. Deputy Robert McClure also interacted with Collins at the scene and thought that Collins, though intoxicated, was alert and able to respond to deputies. Smith thought Collins's speech was slightly slurred, and Collins told Smith several times that he had been drinking. Officers did not administer a breath test to Collins at the scene because they did not usually carry them.

As Collins was wheeled to the ambulance, Deputy Aristen Jorgensen read Collins his *Miranda*[4] rights. In the middle of Jorgensen's advisements, Collins interjected that he had "fucked up." Smith rode with Collins in the ambulance. At various times in the ambulance, Collins said that he had made a mistake, but he also said that he had "made that call." Smith construed Collins's statements to mean that he had made a poor decision, not that the killing was an accident.

When officers later searched the converted barn, they found Seidlinger dead, her body in an armchair and her feet propped up on an ottoman. There were skull fragments

---

[4] *Miranda v. Arizona* (1966) 384 U.S. 436.

4

around the floor and in the surrounding kitchen area. The television was on. Inside, officers also found a bottle of George Dickel whiskey and six firearms.

### 4.    *Collins's Statements at the Hospital*

Sergeant John Habernehl was assigned to watch Collins at Valley Medical Center the same day that Seidlinger was killed. Although Habernehl did not ask Collins about the crime, Collins spontaneously told Habernehl to just let him die and that he did not want to go to prison. Collins said that he had gotten drunk and had gotten into a fight with his girlfriend, after which he picked up his father's Mossberg shotgun and, at point-blank range, pulled the trigger. Habernehl took a gunshot residue swab from Collins, and, as he was swabbing Collins's right hand, Collins "corrected" the deputy, disclosing that he was a left-handed shooter and that it would have been his left hand on the shotgun grip of the gun and his right hand on the pump.

After Habernehl read Collins his *Miranda* rights again, Collins said that he had gotten into a fight with Seidlinger about "getting items promised accomplished in a timely manner" and reiterated that he had grabbed the shotgun and pulled the trigger. Collins also said that he had gone up to the main house to surrender to Stephen, but Stephen shot him, so he pulled out a pocketknife, which he used to stab Stephen. Collins told Habernehl that he had been unable to work because he had injured his knee, and that Seidlinger had come up with the idea that they could claim that he injured his knee on her property and get her homeowner's insurance to cover his medical costs. Collins said he had nothing to eat that day but cumulatively had a fifth of George Dickel Whiskey and a 12-pack of Coors. Habernehl could tell that Collins had been drinking: Collins smelled of alcohol, and his speech was slurred early in the interview. Someone came to take a sample of Collins's blood around 7:50 p.m. that day.

Deputy Amanda Rowe-Kairys was assigned to watch Collins at Valley Medical Center the day after the murder. Collins told Rowe-Kairys that he had been drinking

5

most of the previous day, and he had gotten into an argument with his girlfriend. Collins said that he had retrieved a Mossberg 500 shotgun loaded with birdshot and that he had pointed the gun at Seidlinger and shot her.

Deputy Jordan Brownlee was also assigned to Collins's security at Valley Medical Center the day after the crime. At the time, Collins asked Brownlee if Stephen had survived, and Brownlee told him yes. Collins said that after Stephen shot him, he "faded out."

### 5.    *The Forensic and Other Circumstantial Evidence*

Mark Babione, a Crime Gun Intelligence Coordinator, testified that a pump-action shotgun like the Mossberg used to kill Seidlinger has a slide safety on the top. After testing, Babione determined that Collins's Mossberg had a 6.5-pound trigger pressure—two or three pounds is considered a hair trigger or light pull. Babione test-fired the Mossberg to measure the trigger force six times, and the gun appeared to function properly, though the first time Babione cycled the gun the cartridge did not eject.

According to Babione, if the Mossberg's stock is not positioned on the user's shoulder, its recoil can cause injury. Deputy Christine Jones also testified that the Mossberg stock typically "sits between basically your clavicle bone and shoulder crease" but can be fired from different positions.

Dr. Stephany Fiore, a forensic pathologist, conducted Seidlinger's autopsy. The gunshot to her head entered just above her left ear, with a nearly straight trajectory from left to right, exiting about one and a half inches above her right ear. There was an abrasion collar around the entrance wound, which is usually caused by the pressure of a gun's muzzle against the skin. Fiore accordingly opined that the gun was fired at either point-blank or semi-point-blank range.

Deputy Erik Miyoshi examined text messages that were extracted from Collins's phone. At 11:12 a.m. on the day of the murder, Collins sent someone a message that

read: "I'm going to try to make it back soon. Knee went out and looking like I'm gonna need surgery. I'm also trying to get my ole lady to get me a truck. After all that though I do want to head home."

Miyoshi also examined Seidlinger's phone and created a report showing all the text messages between her and Collins between October 26, 2018, up until January 30, 2019. In some of the messages, Collins expressed frustration with his financial situation.

Adam Lutz, a forensic scientist, tested Collins's blood sample from the hospital and found that he had a 0.191 blood-alcohol level. Lutz estimated that if the blood sample was drawn at 7:50 p.m., at 4:13 p.m. that same day, Collins's blood-alcohol level would have been 0.26. Likewise, if the blood-alcohol level in the sample had been 0.275 at 5:42 p.m., as hospital records reflected, the level would have been approximately 0.30 at 4:13 p.m. Lutz's "retrograde extrapolation" required certain assumptions, including that the individual had no more alcohol in the stomach waiting to be absorbed and that the individual had normal human physiology as a typical burn-off rate is around 0.02 per hour.

According to Lutz, even hardened, experienced, tolerant drinkers are going to be unsafe to drive at a 0.08 blood-alcohol level. In his career, he had seen someone with a 0.4 blood-alcohol level remain conscious, though he had also seen people die from a 0.4 blood-alcohol level. Lutz opined that generally, people may lose consciousness starting from a 0.10 blood-alcohol level or higher, which is when large muscle impairment begins. Memory loss can also occur, either at high or low levels, and individuals with high blood-alcohol levels may have impacted coordination. Combining narcotics with alcohol can cause much greater impairment.

Lutz was familiar with the concept of tolerance—some individuals have an inherent biological tolerance, which permits them to mask impairment effects. Experienced drinkers may develop a tolerance to alcohol. For example, Lutz once

7

observed a woman with a 0.33 blood-alcohol level who was able to walk and interact with officers during a DUI arrest.

## C. *The Defense*

### 1. *Collins's Testimony*

Collins started drinking when he was 12 years old. As an adult, he drank daily, and on occasion he would drink a 12-pack of beer per night.

In the summer of 2018, Collins drove from Mississippi to Santa Cruz, hoping to find work and stay with a friend; along with his dog, he brought his shotgun, rifle, a few pistols, and his tools. Within the first week, he got a job at a construction site, and he later got another job with a contractor due to a connection from Barber. Collins started going to Sir Froggy's to get coffee and watch the news, which is how he met Seidlinger.

As the weather got colder, Seidlinger invited Collins over to use her shower and for dinner. They developed a romantic relationship in the fall of 2018. In November or December 2018, Seidlinger cleared out a few drawers and a dresser in her house and told Collins that he could put his belongings there. Around that time, Collins started frequenting JJ's instead of Sir Froggy's, which he had begun boycotting due to "a miscommunication" about his dog.

In December 2018, Collins hurt his knee and was unable to work. Collins did not have any insurance, but he and Seidlinger were trying to see if Seidlinger's homeowner's insurance would cover Collins's medical cost even though Collins did not actually injure himself on Seidlinger's property. After his knee injury, Collins started drinking more; he would pour whisky in his coffee and would continue drinking throughout the day. He was regularly drinking a 12-pack of beer and sometimes a fifth of whisky.

In the beginning of January 2019, after Seidlinger's two pet goats were killed by a mountain lion, Seidlinger and Collins "staged loaded weapons," including the Mossberg,

8

throughout the house. That way, if either Seidlinger or Collins heard the mountain lion at night, they could grab a "hunting[-]ready" firearm.

Collins knew the fundamentals of gun safety: never point a gun unless one is sure of the target, never point a gun at a person, and keep your finger off the trigger until you are ready to shoot. Collins also knew to keep his trigger finger "index[ed]" on the side of the weapon. He knew the 30-year-old Mossberg: it "kick[ed] like a mule" and was a bit "loose," making "a hell of a racket" when shaken.

Collins remembered only "bits and pieces" of the day that Seidlinger was killed. His memory was blurry in some respects but "very clear" in others. Collins recalled that in the morning, he woke up alone at Seidlinger's house. He had coffee and whisky for breakfast, but he had no food that day. He got to JJ's at around 11:30 a.m. and drank at least three shots of whisky, some water, and a few beers. He spoke with Barber, but he could not recall what he said about his relationship with Seidlinger. He felt drunk and left JJ's sometime in the afternoon, driving 10 to 15 minutes to Seidlinger's house.

Collins remembered that when he arrived at Seidlinger's house, she was in a bad mood and angry with him about something. Collins believed it "[stood] to reason" that he fixed himself a drink, and he remembered "a little bit" that he was in the kitchen. Seidlinger was sitting in her armchair watching television in the living room. Collins recalled that he argued with Seidlinger, but he could not remember what they were arguing about. He remembered thinking that he did not want to be there, and he remembered holding his shotgun, though he did not remember picking it up. Collins believed he had been gathering his things to leave.

Collins remembered that he carried the shotgun "down low like I'd be carrying it walking through the woods." Responding to Collins's preparing to leave, Seidlinger said, "[J]ust go ahead and do it." As Collins was walking between her armchair and the fireplace, he was fiddling with the gun's safety with his "finger indexed" when the

9

shotgun "just went boom" to his surprise. He almost dropped the gun when it fired because it startled him. He could not recall how close he was to Seidlinger when the weapon went off: he was pretty close but did not press the gun against Seidlinger's head.

Seeing that Seidlinger was dead, Collins set the gun down and went to Stephen's house to call for help. Collins entered the main house where Stephen lived and asked him to call 911. Collins told Stephen what happened and that Seidlinger was dead. Collins "[s]ort of" recalled Stephen asking him multiple times whether he killed Seidlinger, and he remembered saying he did not know what happened but that Seidlinger was dead.

Stephen called 911 and handed the phone to Collins. As Collins spoke to the 911 operator, he felt something hit him in the shoulder. Stephen had a gun pointed at him. Collins knocked Stephen's gun away, then stabbed Stephen with his pocketknife until Stephen was subdued. Once Stephen sat down, Collins got back on the phone with the 911 operator and talked "until [he] fell out."

The last thing Collins remembered from that day was that he asked someone to take care of his dog. Collins did not remember being on the gurney, being in the ambulance, or being in the helicopter. He did not remember speaking to any officers that were at his bedside or any officers in the helicopter or in the ambulance. Although he could not recall his conversation with the officers, Collins believed that he likely did not say that the shooting was accidental because it would have made him sound more suspicious and appear guiltier.

Collins described himself as drunk when he killed Seidlinger, and he explained that he had tried to forget a lot about what had happened because it was a "horrible day." Collins had never been physically violent with Seidlinger or with anyone else, and he had never threatened her. Collins described Seidlinger's death as a "horrible accident."

10

Collins was not sure how the gun went off but insisted that he never intentionally pulled the trigger.

Collins admitted that in several text messages, he said that he needed Seidlinger financially. He nonetheless had a fling with another woman in December 2018, which upset Seidlinger. Collins and Seidlinger also exchanged text messages about Collins's knee and Seidlinger's insurance. Several weeks before Seidlinger was killed, Collins had asked Seidlinger for an update about the insurance coverage. Collins also previously told Deputy Miyoshi that on the day of the murder, Seidlinger had told him that she was going to go to her insurance company that day. Collins told Miyoshi that he thought that he and Seidlinger argued about insurance the day of the killing.

When Collins spoke to Miyoshi, he recalled some events but was trying to "figure out what happened" and was guessing at certain points. He ran through several scenarios with Miyoshi, including a scenario where Seidlinger had gotten up to retrieve a knife. Collins told Miyoshi he may have been trying to activate the gun's safety when it went off. He also said that maybe it was "miscoordination or something," but the gun went off "point-blank." At the time, Collins "floated every idea under the sun trying to figure out what exactly happened," but he was now "fairly certain it was an accident."

## 2. *Medical Evidence and Evidence of Alcohol Abuse*

En route to the hospital, Collins received 80 micrograms of fentanyl, as well as one microgram of midazolam, which can make patients woozy or sleepy.

Marisela Sigala, a medical social worker at Valley Medical Center, evaluated Collins for potential substance abuse the day after Seidlinger was killed. At the time, Collins shared that he was having mental health issues and had been previously diagnosed with post-traumatic stress disorder. Nurse Heather Stone also evaluated Collins that day. Collins told Stone that he was a very heavy drinker, and he said that he thought he should be considered an alcoholic.

11

### 3.    *Collins's Ex-Girlfriend*

Collins's ex-girlfriend dated him on and off between 2011 and 2014. She described Collins as honest, well read, and highly intelligent. She testified that Collins was never physically or verbally violent toward her. When Collins got angry, he would usually get quiet and walk away. Although Collins drank alcohol every day, his ex-girlfriend did not recall him ever blacking out or losing control.

## D.    *The Rebuttal*

Deputy Miyoshi spoke to Collins the day after the murder, and it did not seem that Collins was confused—he was coherent and did not slur his speech at all. Collins told Miyoshi that Seidlinger was mean to him when she drank, but he stayed with her because he was financially dependent on her. Collins said that his plan was to get his knee fixed, pay off his truck, get back to work, and then eventually move back to Mississippi. Collins told Miyoshi he and Seidlinger were trying to get insurance coverage for his knee, and he said that it was "emasculating" to have to depend on Seidlinger.

According to Miyoshi, Collins said that on the day of the murder, Seidlinger was supposed to go to her insurance company to inquire about the claim; because she did not end up going, she and Collins argued about it. At some point during the argument, Collins got up and retrieved the shotgun. Seidlinger saw him with the shotgun, turned back to focus on the television, and said "fucking just do it." Collins said that he recalled that he had the finger on the trigger as well as the safety, and the shotgun "blew up." Collins specifically said that he pulled the trigger. Collins also described walking up to Stephen's house and stabbing Stephen; he said he aimed for Stephen's left jugular because he was trained to stop threats.

Collins indicated to Miyoshi that he remembered only bits and pieces of being in the hospital. Collins told Miyoshi that he may have killed Seidlinger in self-defense because she may have had a knife or could have gotten a knife. During parts of the

12

interview, Collins appeared to be "just kind of guessing," and he was not completely sure about some of the "minor details."

### E.    *The Verdict and Sentencing*

On July 23, 2021, the jury found Collins not guilty of first degree murder but guilty of second degree murder (§ 187, subd. (a)).  The jury also found true the allegation that Collins personally and intentionally discharged a firearm (§ 12022.53, subd. (d)).  On February 10, 2022, the trial court struck the section 12022.53, subdivision (d) enhancement under section 1385 and exercised its discretion to instead impose the lesser enhancement under section 12022.53, subdivision (b).[5]  The trial court thereafter sentenced Collins to a total term of 25 years to life in prison, composed of a term of 15 years to life for second degree murder and 10 years for the firearms enhancement.

## II.    DISCUSSION

### A.    *Ineffective Assistance of Counsel*

Collins argues that trial counsel rendered ineffective assistance by failing to secure a final ruling on the admissibility of expert testimony on "alcoholic blackouts" and failing to seek admission of his prior consistent statement that he had been "blackout drunk" on the day of Seidlinger's killing.  On this record, Collins is unable to demonstrate that counsel's performance was deficient.

#### 1.    *Legal Principles*

To establish a violation of the right to effective assistance to counsel under the Sixth Amendment, a defendant must show that counsel's performance fell below an

---

[5] In *People v. Tirado* (2022) 12 Cal.5th 688 at page 700, the California Supreme Court held that if a jury finds true the facts supporting a section 12022.53, subdivision (d) enhancement, but the trial court determines that enhancement should be stricken or dismissed, the court may impose the lesser enhancement under section 12022.53, subdivisions (b) or (c).

13

objective standard of reasonableness and that the defendant was prejudiced by counsel's acts or omissions. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688 (*Strickland*).) A defendant is prejudiced if it is reasonably probable that in the absence of counsel's errors, the result of the proceeding would have been different. (*Id.* at p. 694.)

"On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*People v. Mai* (2013) 57 Cal.4th 986, 1009 (*Mai*).)

### 2. *Expert Testimony*

#### a. *Additional Background*

On June 14, 2021, the prosecutor filed a motion in limine seeking to preclude defense expert Ed Barley from testifying about unconsciousness and alcohol-induced blackouts, arguing that such testimony would be speculative because there was no evidence that Collins experienced an alcoholic blackout the day he killed Seidlinger. Defense counsel opposed the prosecutor's motion in limine, arguing that the trial court should defer ruling on the motion until an evidentiary record was established as Collins had yet to testify, and Collins had previously claimed that his memory of the afternoon was "unclear." But defense counsel acknowledged that Barley had not yet prepared a report summarizing his testimony, and that she intended to "ask[ Lutz] questions on the same topic" as Barley.

On June 28, 2021, the trial court held a hearing on the motions in limine. The prosecutor represented that he had yet to receive information from the defense about the contents of Barley's testimony. Defense counsel stated that she intended to ask Barley to do a retrograde analysis to determine Collins's blood-alcohol level at the time of the

14

killing, and she also intended to ask Barley "questions about just the fact of alcohol intoxication on the human body generally." The trial court specifically asked: "You do not intend to elicit from Mr. Barley any testimony that it's his opinion that Mr. Collins was blacked out or unconscious or incapable of acting—a volitional act." Defense counsel answered, "At this point, I do not." Defense counsel later reiterated that it was her position that the trial court should defer its ruling on the admission of Barley's testimony until Collins testified.

The trial court stated that in order for Barley to opine that Collins was in a "blacked out state or incapable, so impaired that he was incapable of acting volitionally or unconscious," the court would need to have "an appropriate foundation concerning education, training, experience to render an opinion of that nature, and, two, an appropriate factual predicate for the opinion that doesn't rely on speculation or conjecture or is contrary to the evidence at the time of the proposed testimony."

The trial court thereafter deferred ruling on the admissibility of the defense's expert testimony, stating: "I will listen to the evidence carefully, to the extent you believe, [defense counsel], that the necessary factual predicate has been established before you pose the question, tell me it's your intention to ask it." At trial, however, defense counsel did not call Barley as a witness.

### b. *Analysis*

Collins argues that defense counsel was ineffective for failing to request a final ruling on the admissibility of Barley's testimony. We find no merit in his argument. Because it is unclear whether Barley's proposed testimony would have differed from Lutz's testimony about the impact of alcohol on a person's consciousness and ability to recall events, the record does not affirmatively demonstrate that defense counsel had no rational, tactical reason for failing to request a final ruling.

15

The absence of an offer of proof setting forth how the proffered expert testimony would be noncumulative and supportive of an inference of unconsciousness is fatal to Collins's claim of ineffective assistance of counsel. To succeed on his claim, Collins must identify what exculpatory evidence would have been revealed by the examination of the defense expert, which " 'must be supported by declarations or other proffered testimony establishing both the substance of the omitted evidence and its likelihood for exonerating the accused.' " (*People v. Bolin* (1998) 18 Cal.4th 297, 334 (*Bolin*).) During the hearing on the motions in limine, defense counsel's description of Barley's proposed testimony was generic: defense counsel stated that she intended to elicit testimony from Barley on the impairment effects of alcohol, which largely echoed the opinions that were later rendered by Lutz—that alcohol can cause impairments and even unconsciousness at high levels. And at one point, defense counsel specifically averred that she was *not* going to ask Barley about whether Collins was blacked out or unconscious. And even earlier, defense counsel acknowledged that she intended to ask Lutz and Barley similar questions.

On appeal, Collins appears to suggest that Barley would have opined that Collins's blood-alcohol level, combined with his testimony that he was unable to recall certain details of Seidlinger's killing, renders it likely that Collins was unconscious when the fatal shot was fired. Yet " '[w]e cannot evaluate alleged deficiencies in counsel's representation solely on [Collins's] unsubstantiated speculation' " (*Bolin*, *supra*, 18 Cal.4th at p. 334) about the contents of Barley's testimony. During the hearing before the trial court, defense counsel specified that she believed that Barley's opinion would be relevant as follows: "If someone is saying they can't remember what happened and is also a .30 alcohol, I think an expert—just extrapolating down the line—that an expert should be able to use those two facts to make an opinion about that." Yet defense counsel never specified *what* Barley's opinion would be. (See *People v. Medina* (1995)

16

11 Cal.4th 694, 773 [on direct appeal, "a claim of ineffective counsel cannot be established by mere speculation regarding the 'likely' testimony of potentially available witnesses"].)[6]

Furthermore, defense counsel's decision to call certain witnesses is typically a matter of trial tactics. (*Bolin*, *supra*, 18 Cal.4th at p. 334.) Given that Lutz provided expert testimony on the impairment effects of alcohol and even opined that individuals may start to lose consciousness at a 0.10 blood-alcohol level or higher, defense counsel may have had a valid, tactical reason for failing to seek a final ruling on the admissibility of Barley's testimony. Defense counsel may have concluded that Barley's proposed testimony would have been largely redundant of Lutz's opinion, rendering it superfluous. (See *People v. Cunningham* (2001) 25 Cal.4th 926, 1005 [defendant cannot prevail on claim of ineffective assistance for failing to secure expert witnesses because certain information was already established by prosecution witnesses].) It is also possible that given Collins's testimony that he recalled that the gun went off accidentally, defense counsel may have strategically decided that calling into question Collins's memory of the killing by introducing testimony about alcoholic blackouts would serve only to weaken the defense. We cannot second guess defense counsel's trial tactics on appeal. (*People v. Mitcham* (1992) 1 Cal.4th 1027, 1059.)[7]

---

[6] In his opening brief, Collins argues that in *People v. Edwards* (2013) 57 Cal.4th 658, the California Supreme Court determined that expert testimony on alcoholic blackouts was admissible. (*Id.* at p. 756.) In *Edwards*—an affirmance holding, among other things, that the trial court did not abuse its discretion in admitting expert testimony—the trial court held an evidentiary hearing outside the presence of the jury on the prosecution expert's testimony, thereby establishing the substance of the expert testimony to be ruled on. (*Ibid.*) Here, it is unclear from defense counsel's limited proffer what the contents of Barley's testimony would have been.

[7] During closing argument, defense counsel argued that Seidlinger's killing was a "tragic, drunk accident." Defense counsel also argued that Collins was impaired at the time of the killing because of his high blood-alcohol level, which may have impacted his

Accordingly, the record does not affirmatively disclose that trial counsel had no rational, tactical purpose for failing to call the witness, nor is this a situation where there can be no satisfactory explanation. (*Mai*, *supra*, 57 Cal.4th at p. 1009.) Collins is therefore unable to demonstrate his counsel was ineffective on this ground.

### 3. *Prior Consistent Statement*

#### a. *Additional Background*

At trial, Collins sought to admit his prior statement to nurse Heather Stone, who treated him at the hospital the day after he was arrested. According to Stone, Collins told her that he was " 'blackout drunk' the night before." The trial court excluded the statement after concluding that it was "concerning a prior mental state." Citing Evidence Code sections 1250 and 1252, the trial court further noted that the statement was untrustworthy because Collins made them at a time when he was aware that he had committed a homicide and had an opportunity to reflect.[8] The trial court, however, indicated that Collins could "certainly" testify about his own mental state himself and, if warranted, his prior consistent statement may be admitted.

During trial, Collins testified that he had been drinking heavily the day of the crime and that he had trouble recalling all of what transpired. Moreover, Collins testified that after officers arrived at Stephen's house, he did not remember being on the gurney, being in the ambulance, or being in the helicopter. He could not recall anything else until

---

memory. Based on the evidence, defense counsel urged the jury, "involuntary manslaughter is what I'm suggesting you convict Mr. Collins of."

[8] Under Evidence Code section 1250, subdivision (a), "evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) is not made inadmissible by the hearsay rule" under certain specified circumstances, subject to Evidence Code section 1252. Evidence Code section 1252 prohibits the admission of statements "if the statement was made under circumstances such as to indicate its lack of trustworthiness."

the following day. At no point did defense counsel seek to introduce Collins's prior statement that he had been "blackout drunk."

**b.** *Analysis*

Collins argues that defense counsel was ineffective for failing to seek admission of his prior statement that he was "blackout drunk" because the prosecutor insinuated during cross-examination that he was fabricating his claim that he did not recall all the events of the crime. He argues that at that time, had defense counsel proffered his prior statement, the trial court would have admitted it. We are not persuaded by Collins's argument.

Under Evidence Code section 1236, "[e]vidence of a statement previously made by a witness is not made inadmissible by the hearsay rule if the statement is consistent with his testimony at the hearing and is offered in compliance with Section 791." Under Evidence Code section 791, subdivision (b), a prior consistent statement may be admitted to support the credibility of a testifying witness if "[a]n express or implied charge has been made that his testimony at the hearing is recently fabricated or is influenced by bias or other improper motive, and the statement was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen."[9]

Here, defense counsel could have reasonably believed that Collins's statement that he was "blackout drunk" would be inadmissible under Evidence Code sections 791 and 1236. His statements to the nurse Stone were made *after* his arrest for killing Seidlinger—his statements were therefore not made "before the bias, motive for

---

[9] A prior consistent statement can also be admitted if "(a) Evidence of a statement made by him that is inconsistent with any part of his testimony at the hearing has been admitted for the purpose of attacking his credibility, and the statement was made before the alleged inconsistent statement." (Evid. Code, § 791, subd. (a).) In his opening brief, Collins argues only that defense counsel rendered ineffective assistance by failing to secure admission of his prior statement under Evidence Code section 791, subdivision (b).

fabrication, or other improper motive is alleged to have arisen." (Evid. Code, § 791, subd. (b).) Collins does not identify any other bias or motive to fabricate aside from a desire to be free from criminal prosecution. (Cf. *People v. Dalton* (2019) 7 Cal.5th 166, 234 [Evid. Code, § 791 does not require witness to be free from all possible bias, so long as the statement was made before at least one improper motive arose].)

*People v. Kopatz* (2015) 61 Cal.4th 62, upon which Collins relies, is distinguishable. There, the California Supreme Court held that the trial court did not err in permitting a witness's prior consistent statement after the prosecutor impliedly charged that the witness had recently fabricated his identification of the defendant after seeing the defendant's photograph in a newspaper. (*Id.* at pp. 86-87.) The trial court, however, permitted the witness's wife to testify that the witness had told her that he had seen a man he later identified as the defendant. (*Id.* at p. 83.) In other words, the prior consistent statement in *Kopatz* was made before the motive to fabricate arose—when the witness saw the defendant's photograph.

In this case, the trial court had expressed that because Collins had made his statement to Stone after the killing, he did so having had the opportunity to reflect—signaling its determination that Collins at the time already had a motive to fabricate. Based on the trial court's comments about the lack of trustworthiness under Evidence Code section 1252, defense counsel may have reasonably believed that seeking admission of the statement under Evidence Code section 791 would have been futile. "A decision not to pursue futile or frivolous motions does not make an attorney ineffective." (*People v. Bell* (2019) 7 Cal.5th 70, 126.)

Accordingly, Collins has not met his burden to demonstrate that trial counsel's performance fell below an objective standard of reasonableness, as counsel could have concluded that seeking to admit the statement was futile. (*Strickland*, *supra*, 466 U.S. at

pp. 687-688.) Accordingly, Collins's claim of ineffective assistance of counsel on this ground fails.[10]

**B.** *Instructional Error*

Collins argues that the trial court erred by declining the defense request to instruct the jury with CALCRIM No. 626, the instruction on voluntary intoxication causing unconsciousness and involuntary manslaughter, after concluding that "[a]ll the evidence belies any form of unconsciousness." As we explain, we conclude that even if we assume the trial court erred, the error was harmless.

**1.** *Legal Principles*

Here, Collins was convicted of second degree murder. Second degree murder is the unlawful killing of another human being with malice aforethought but without willfulness, premeditation, or deliberation—second degree murder can involve either express malice or implied malice. (*People v. Rogers* (2006) 39 Cal.4th 826, 867 (*Rogers*).) "Implied malice does not require an intent to kill. Malice is implied when a person willfully does an act, the natural and probable consequences of which are dangerous to human life, and the person knowingly acts with conscious disregard for the danger to life that the act poses." (*People v. Gonzalez* (2012) 54 Cal.4th 643, 653.)

---

[10] We observe that Collins argues in part that defense counsel's omissions were prejudicial because his defense was "reframed as an accidental shooting after the court ruled against the expert testimony [on alcoholic blackouts], admission of appellant's statements about being blackout drunk or lacking memory to medical staff, and instruction on unconsciousness due to voluntary intoxication." Since we find no deficient performance, we need not address the issue of prejudice. Nevertheless, we question Collin's characterization of his defense as being "reframed" by the lack of expert testimony or failure of counsel to secure admission of a prior consistent statement. Collins himself testified at trial, and during his testimony, he reiterated numerous times that he believed the shooting was accidental.

21

As indicated, the defense requested that the trial court instruct the jury with a modified version of CALCRIM No. 626 as follows: "Voluntary intoxication may cause a person to be unconscious of his or her actions. A very intoxicated person may still be capable of physical movement but may not be aware of his or her actions or the nature of those actions. [¶] A person is *voluntarily intoxicated* if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect. [¶] '[U]nconsciousness can exist . . . where the subject physically acts in fact but is not, at the time, conscious of acting.' (*People v. Ochoa* (1998) 19 Cal.4th 353, 424 [(*Ochoa*)].) [¶] When a person voluntarily causes his or her own intoxication to the point of unconsciousness, the person assumes the risk that while unconscious he or she will commit acts inherently dangerous to human life. If someone dies as a result of the actions of a person who was unconscious due to voluntary intoxication, then the killing is involuntary manslaughter."[11]   (Italics added.)

The proposed version of CALCRIM No. 626 continued: "Involuntary manslaughter has been proved if you find beyond a reasonable doubt that: [¶] 1. The defendant killed without legal justification or excuse; [¶] 2. The defendant did not act with the intent to kill; [¶] 3. The defendant did not act with a conscious disregard for human life; [¶] AND [¶] 4. As a result of voluntary intoxication, the defendant was not conscious of his actions or the nature of those actions. [¶] The People have the burden of

---

[11] Collins's proposed version of CALCRIM No. 626 is identical to the standard language of the instruction, except his version adds in the quote from *Ochoa*, *supra*, 19 Cal.4th at p. 424.

22

proving beyond a reasonable doubt that the defendant was not unconscious. If the People have not met this burden, you must find the defendant not guilty of murder."[12]

Instruction on unconsciousness, as with voluntary intoxication, is "more like [a] 'pinpoint' instruction[] . . . to which a defendant is entitled upon request. Such instructions relate particular facts to a legal issue in the case or 'pinpoint' the crux of a defendant's case, such as mistaken identification or alibi. [Citation.] They are required to be given upon request when there is evidence supportive of the theory, but they are not required to be given sua sponte." (*People v. Saille* (1991) 54 Cal.3d 1103, 1119; see also *People v. Bolden* (2002) 29 Cal.4th 515, 559 [voluntary intoxication "is a form of pinpoint instruction"].) Substantial evidence supportive of the theory is "evidence sufficient for a reasonable jury to find in favor of the defendant." (*People v. Salas* (2006) 37 Cal.4th 967, 982.) "In determining whether the evidence is sufficient to warrant a jury instruction, the trial court does not determine the credibility of the defense evidence, but only whether 'there was evidence which, if believed by the jury, was sufficient to raise a reasonable doubt.'" (*Ibid.*)

**2.    *Prejudice***

Assuming that the trial court erred in failing to instruct the jury with CALCRIM No. 626, any error was harmless.

Typically, "[t]he sua sponte duty to instruct fully on all lesser included offenses suggested by the evidence arises from California law alone." (*People v. Breverman* (1998) 19 Cal.4th 142, 149.) Accordingly, in order to establish prejudicial error caused by a failure to instruct on a lesser included offense in a noncapital case, the defendant " 'must show it is reasonably probable a more favorable result would have been obtained

---

[12] The jury was instructed with the standard instructions on voluntary manslaughter (CALCRIM No. 570) and involuntary manslaughter (CALCRIM No. 580).

23

absent the error' " under *People v. Watson* (1956) 46 Cal.2d 818, 836.  (*People v. Beltran* (2013) 56 Cal.4th 935, 955.)

Yet in the somewhat analogous situation where a trial court has declined to instruct the jury with a requested instruction on heat of passion manslaughter, the Courts of Appeal are divided over whether error from a failure to instruct must be reviewed under the *Watson* standard or the more stringent "harmless beyond a reasonable doubt" standard articulated in *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*) for violations of federal constitutional rights.  (See *People v. Thomas* (2013) 218 Cal.App.4th 630, 644 (*Thomas*); *People v. Peau* (2015) 236 Cal.App.4th 823, 830; *People v. Wright* (2015) 242 Cal.App.4th 1461, 1495, fn. 14; *People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1145-1146.)  *Thomas* held that the *Chapman* standard applies in part because heat of passion manslaughter negates the element of malice—if provocation is presented in a murder case, proving malice requires the prosecution to prove the *absence* of provocation beyond a reasonable doubt.  (*Thomas*, *supra*, at p. 644.)  And "jury instructions relieving the prosecution of the burden of proving beyond a reasonable doubt each element of the charged offense violate the defendant's due process rights under the federal constitution." (*People v. Flood* (1998) 18 Cal.4th 470, 491.)[13]

Citing *Thomas*, Collins suggests that the *Chapman* standard applies to this case. As with heat of passion manslaughter, the prosecution must prove that the defendant was *not* unconscious beyond a reasonable doubt to overcome a defense argument that the

---

[13] In *People v. Moye* (2009) 47 Cal.4th 537, the Supreme Court applied the *Watson* standard to evaluate prejudice from the trial court's failure to give a requested instruction on heat of passion voluntary manslaughter.  (*Id.* at p. 555-556.)  But in *Moye*, the defendant did not argue that instructions were defective under federal law because they incompletely defined malice, thereby requiring the application of the *Chapman* standard. (*Moye*, *supra*, at p. 558, fn. 5.)  Therefore, the *Moye* court reaffirmed that this issue remained open until there was a case in which it has been fully raised and briefed.  (*Ibid.*)

24

defendant committed only involuntary manslaughter due to unconsciousness from voluntary intoxication. (See *People v. Babbitt* (1988) 45 Cal.3d 660, 693 (*Babbitt*); CALCRIM No. 626.) In part, voluntary intoxication reduces murder to involuntary manslaughter because a defendant's voluntary intoxication can negate express malice— though it *cannot* negate implied malice. (*People v. Soto* (2018) 4 Cal.5th 968, 977 (*Soto*); *People v. Timms* (2007) 151 Cal.App.4th 1292, 1301 (*Timms*).) However, as explained in *Babbitt*, unconsciousness is a defense: although the state has the burden of disproving unconsciousness once it has been raised by the defendant, "this fact of itself does not transform absence of the defense—consciousness—into an element of murder for purposes of due process analysis." (*Babbitt*, *supra*, 45 Cal.3d at p. 693.) Regardless, we need not decide whether *Watson* or *Chapman* applies in this case because even under the more stringent *Chapman* standard, any error was harmless.

First, voluntary intoxication causing unconsciousness cannot negate implied malice. " 'Unconsciousness caused by voluntary intoxication is . . . governed by section [29.4].' " (*People v. Carlson* (2011) 200 Cal.App.4th 695, 705 (*Carlson*).) Section 29.4, subdivision (a) states in pertinent part: "No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his or her having been in that condition." Section 29.4, subdivision (b) permits evidence of voluntary intoxication "solely on the issue of whether or not the defendant actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or *harbored express malice aforethought*." (Italics added.) Thus, when enacting section 29.4, the Legislature took the position that "evidence of voluntary intoxication is not admissible on the question of implied malice, that is, to prove that defendants did not know of the danger they were creating by their actions, or that they did not consciously disregard that danger." (*Soto*, *supra*, 4 Cal.5th at p. 977; *Carlson*, *supra*, at p. 706; *Timms*, *supra*, 151 Cal.App.4th at p. 1298.) "No reason exists to carve out an exception

25

[to section 29.4] where a person drinks so much as to render him or her unconscious." (*Carlson*, *supra*, at p. 707.)

In this case, the verdict of second degree murder necessarily reflects that the jury concluded that Collins either had the intent to kill Seidlinger under an express malice theory or that Collins killed Seidlinger with implied malice. The jury was instructed as to both theories, and the prosecutor argued both at trial; thus, we agree with Collins that it is unclear under which theory he was convicted. However, as voluntary intoxication causing unconsciousness can only negate *express* and not implied malice, if the jury convicted Collins under an implied malice theory, the trial court's refusal to instruct with CALCRIM No. 626 had no bearing on the verdict. And if the jury convicted Collins on an express malice theory, the jury was already instructed with CALCRIM No. 625 on the limited purpose of voluntary intoxication, as set forth in section 29.4. As instructed, the jury was told that it may consider evidence of Collins's voluntary intoxication "only in deciding whether [he] acted *with an intent to kill*, or [he] acted with deliberation and premeditation." (Italics added.) In other words, the jury was already instructed that it could consider Collins's voluntary intoxication as it pertained to an express malice murder, which requires an intent to kill. Although the jury's second degree murder verdict may suggest that it found Collins's voluntary intoxication rendered him unable to deliberate or premeditate, if the jury found Collins guilty on an express malice theory, it must have necessarily concluded that his state of intoxication was insufficient to raise a reasonable doubt as to his intent to kill.

Second, there was overwhelming evidence that Collins was conscious at the time of the shooting. Collins was sufficiently cognizant of his actions to be able to later recount details of the shooting itself. He testified that although he did not recall pulling the trigger, he remembered fiddling with the gun's safety when the gun discharged. His testimony therefore did not demonstrate that he lacked "awareness of his actions" at the

26

time of the shooting.  (See *People v. Halvorsen* (2007) 42 Cal.4th 379, 418.)  Likewise, Collins was able to coherently explain—to Stephen, to the 911 dispatcher, and to responding officers shortly after the shooting took place—what had happened.  Collins's ability to recount what had happened in turn implies a cognitive appreciation of what he was doing as those events unfolded.  And there was evidence that Collins was able to engage in purposeful conduct immediately before and after the fatal shooting—immediately before, he argued with Seidlinger, picked up the shotgun and "fiddled with the safety"; afterward, he was able to promptly walk to Stephen's house, ask Stephen to call 911, and disarm Stephen in self-defense.  (*Ibid.*)

Thus, even assuming the trial court erred in declining to give CALCRIM No. 626, reversal is not required.  We conclude beyond a reasonable doubt that the trial court's failure to give the instruction "did not contribute" to the verdict.  (*Chapman*, *supra*, 386 U.S. at p. 26.)

### C.    *Cumulative Error*

Lastly, Collins argues that the cumulative effect of all the alleged errors in his case require reversal of his convictions.  "In theory, the aggregate prejudice from several different errors occurring at trial could require reversal even if no single error was prejudicial by itself."  (*In re Reno* (2012) 55 Cal.4th 428, 483.)  Here, we have found no errors, though we have concluded that even if we were to assume that the trial court erred by declining to instruct the jury with CALCRIM No. 626, any error was not prejudicial. As there are no additional errors to cumulate, reversal is not required.

### III.    DISPOSITION

The judgment is affirmed.

_____

LIE, J.

WE CONCUR:

_____

GROVER, ACTING P.J.

_____

BROMBERG, J.

*People v. Collins*
H049891